**Rolander GILES, Plaintiff,**

v.

**John HENRY, Rocky Ashenbrenner; Crispus C. Nix; Charles Harper; and Sgt. R. Carter, Defendants.**

No. 4–91–CV–30565.

United States District Court, S.D. Iowa, C.D.

Dec. 29, 1993.

Jeffrey M. Lipman, Des Moines, IA, for plaintiff.

William Hill and Suzie A. Berregaard Thomas, Asst. Attys. Gen. for the State of IA, for defendants.

## MEMORANDUM OPINION AND ORDER

BENNETT, United States Magistrate Judge.

Rolander Giles is an inmate at the Iowa State Penitentiary ("ISP") in Fort Madison, Iowa. On June 2, 1991, Giles received a disciplinary notice for allegedly violating ISP regulations for playing the radio in his cell too loud. In a prison administrative proceeding, Giles was found guilty of playing his radio in his cell too loud. Giles, an African–American, alleges in this 42 U.S.C. § 1983 action that he received harsher discipline as a result of the loud radio incident than three allegedly similarly situated white inmates, thus violating the equal protection clause of the Fourteenth Amendment of the United States Constitution. Giles seeks compensatory and punitive damages as well as attorney fees pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988.

## I. INTRODUCTION AND BACKGROUND.

Giles filed a *pro se* complaint on September 10, 1991. On September 30, 1991, Giles filed a motion for appointment of counsel. On November 22, 1991, counsel filed his appearance on behalf of Giles. In this court's initial review order of September 10, 1991, the Honorable Harold D. Vietor, pursuant to 42 U.S.C. § 1997e(a) stayed the federal court proceedings to require Giles to exhaust his administrative remedies. On October 26, 1991, Judge Vietor issued an order lifting the stay and requiring the Plaintiff to file an amended and substituted complaint on or before January 27, 1992. On February 14, 1992, Giles' counsel filed an amended complaint.

On May 26, 1992, while engaged in discovery on the merits of Giles' complaint, the parties filed a consent to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Following a final pretrial conference, this matter was tried to the court on November 1, 1993. Jeffrey M. Lipman of the Lipman Law Firm, P.C., Des Moines, Iowa appeared on behalf of Giles. William Hill, Assistant Attorney General, appeared on behalf of the Defendants.

## II. FACTUAL FINDINGS.

Giles has been an inmate at ISP since 1989. In June 1991, Giles resided in cellhouse 218 in protective custody status. As a privilege of protected custody status, he was allowed to have a radio in his cell. On June 2, 1991, Giles received a Class I major disciplinary notice which stated as follows:

> At approximately 6:20 p.m. on the above date I, c/o Spurgin and c/o Boyer were removing inmate Munz 202681 from DD status. While we were doing this, we noticed that Giles 803735 was playing his radio too loud and that the radio was sitting on the bars. We then had to ask Giles repeatedly to turn the volume down and also to remove the radio from the bars. Giles became verbally abusive saying that "he owned the place" and that it wasn't in the rules anywhere that you can't leave radios on cell bars. He then finally did what we requested. Later the same evening we noticed that his radio was too loud again. Sgt. Rhodes shut off his power at 8:20 p.m. *This report comes after Giles was warned three times by staff members on the 2–10 and 10–6 shifts and can be found in the warning log for CH 218 Red Tag.*

The disciplinary notice alleged violations of five separate ISP rules and regulations. Following a brief investigation, Giles was found

by Defendant Charles Harper, on June 4, 1991, to have violated ISP Regulation 23.[1] Harper found that Giles' conduct did not violate ISP Rules 26, 27, 35 and 41. As a result of the June 4, 1991 disciplinary hearing, Harper imposed a sanction of loss of radio for 90 non-disciplinary detention days as well as a loss of 16 days good time.

ISP regulations allow inmates to appeal disciplinary sanctions within twenty-four hours of the disciplinary hearing. Giles availed himself of this right to appeal. On June 7, 1991, his appeal was denied by Roger G. Welder, Executive Assistant to then Warden Nix. Welder also affirmed the sanction imposed by Harper.[2]

In addition to the 16 days of lost good time, the sanctions specifically imposed loss of the radio for 90 non-disciplinary detention days. Disciplinary detention is the most severe sanction available as part of the ISP disciplinary process. Inmates in disciplinary detention are not allowed to use a radio. Thus, if Harper had allowed Giles to use disciplinary detention days to serve his sanction for loss of his radio this would have been the equivalent of no sanction at all. Therefore, Giles was specifically sanctioned for 90 *non-disciplinary* detention days.

Harper testified and the court finds that there is no set penalty for various ISP rule infractions. Harper has considerable discretion in determining the appropriate penalty. In theory, Harper is guided by the following guidelines for sanctions contained in the Section III(D)(12) of the *Rules, Regulations and Disciplinary Procedures for the Government of the Iowa State Penitentiary Inmates* ("ISP Handbook"):

> If the inmate is found to have committed the rule violation(s), the Disciplinary Committee may impose one or more of the sanctions appropriate to he class of offense involved, based upon consideration of guidelines as follows:
>
> (1) Inmate safety;
>
> (2) Inmate's ability to handle obligations of the inmate's current assignment and privileges within the facility;
>
> (3) Inmate's potential to function appropriately within the overall operation of the institution. For example, by participating in rehabilitating programs.
>
> (4) Seriousness of the offense;
>
> (5) Violent behavior pattern;
>
> (6) Substance abuse;
>
> (7) Escape risk;
>
> (8) Violation of one or more Class I or II offense(s) within the preceding ninety (90) days;
>
> (9) Mitigating factors weighing favorably for accused inmate;
>
> (10) Prior violations of the same or similar rules.

Except for the possible consideration of Giles' prior disciplinary record, Harper did not articulate any of the ten factors set forth in Section III(D)(12) of the ISP handbook as applied to the discipline imposed on Giles. The court finds that the evidentiary record is silent as to whether Harper actually utilized these factors in imposing discipline on Giles for the three white inmates who Giles alleges are similarly situated.

At trial, Giles offered documentary evidence concerning discipline imposed against three white inmates, Greer, McGonigle, and Miller. On May 5, 1991, inmate Greer was given a disciplinary notice for playing his radio too loud after he had been told and warned three times for an excessively loud radio. On May 10, 1991, Harper found that inmate Greer violated Rule 23 and imposed

---

1. Regulation 23 entitled *Disobeying a Lawful Order* states:

   An inmate commits an offense under this subsection when the inmate refuses to obey an order, rule, regulation, or procedure, written or verbal, given by any staff of the Division of Corrections, or other person in authority, which is reasonable in nature, and which gives reasonable notice of the conduct expected.

2. On October 6, 1991, Giles was disciplined a second time for having a radio too loud and received a sanction of loss of the radio for 180 days non-disciplinary detention days and loss of 180 days good time. While this second incident is part of Giles' proof of allegedly discriminatory discipline, Giles is not specifically challenging the imposition of discipline arising out of this incident.

the following sanction: loss of radio for 90 days, and loss of 16 days good time. However, Harper suspended the 90 day loss of the radio "to encourage good conduct."

On December 2, 1992, inmate McGonigle was given a disciplinary notice for having his television on too loud. On December 5, 1992, inmate McGonigle was found to have violated Rule 23, as well as Rules 27 and 41 and received a sanction of loss of his television for seven days. McGonigle subsequently received disciplinary notices on January 12 and January 13, 1993 for separate incidents of having his television on too loud. On January 15, 1993, inmate McGonigle received a sanction for the January 12, 1993 too loud television incident of ten days loss of disciplinary detention days of television and 90 days loss of good time. After the January 13, 1993 too loud t.v. incident, McGonigle received loss of television for 90 non-disciplinary detention days and loss of 90 days good time. Both of these sanctions were imposed by Harper.

On January 13, 1993 inmate Miller received loss of television for 90 non-disciplinary detention days and loss of 90 days good time. This was the result of a January 9, 1993 disciplinary notice for his television being too loud.

In his testimony at trial, Harper attempted to justify the imposition of sanctions on Giles based upon the fact that he had previously disciplined Giles for other disciplinary matters. Harper was unsure of the prior disciplinary records of the three white inmates, although he conceded that he knew Greer had received prior discipline. Most disturbingly, Harper testified when he imposed discipline on an inmate, he did not have their prior disciplinary record before him.

### III.  CONCLUSIONS OF LAW.

■   Giles asserts that Defendants have violated his right to equal protection by discriminating against him in their disciplinary decision because of his race. The equal protection rubric protects against discriminatory treatment of similarly situated persons. R. Rotunda, J. Nowak & J. Young, 2 *Treatise on Constitutional Law* § 18.2, at 318 (1986 & 1991 Supp.). "The central purpose of the

Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The United States Supreme Court has held that in order to prevail on an equal protection claim, a plaintiff must show that a particular defendant acted with discriminatory purpose. *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987); *Davis*, 426 U.S. at 240, 96 S.Ct. at 2048; *see Tyler v. Hot Springs School Dist. No. 6*, 827 F.2d 1227, 1230 (8th Cir.1987).

■   A finding of intentional discrimination must be based on a totality of the circumstances. *See Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). The mere showing that there is a discriminatory effect to a particular action or policy is not sufficient to establish an equal protection violation. *Washington*, 426 U.S. at 242, 96 S.Ct. at 2049; *see Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-66, 97 S.Ct. 555, 563-64, 50 L.Ed.2d 450 (1977); *Williams v. Anderson*, 562 F.2d 1081, 1087 (8th Cir.1977); *see also Minority Police Officers Ass'n v. City of South Bend*, 617 F.Supp. 1330, 1348 (N.D.Ind.1985), *aff'd*, 801 F.2d 964 (7th Cir. 1986) (noting in equal protection challenge to promotion policy in police department that official action will generally not be held unconstitutional solely because which it results in racially disproportionate impact); *Betts v. McCaughtry*, 827 F.Supp. 1400, 1404 (W.D.Wis.1993) (holding that the fact that nearly all music cassettes censored by prison authorities was african-american rap music failed to demonstrate that the purpose of the ban was to discriminate against african-american inmates).

■   Whether discriminatory purpose was a motivating factor in the decision in question requires inquiry into such direct and circumstantial evidence of intent as may be available. *Village of Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564. Conclusory allegations of racial bias, however, do not establish the existence of discriminatory intent. *Minority Police Officers Ass'n*, 801

F.2d at 967. Evidence that may provide a basis for determining the motives behind the decision include the historical background of the decision, substantive departures from the normal procedure or considerations, and minutes of meeting or reports. *See Village of Arlington Heights,* 429 U.S. at 267–68, 97 S.Ct. at 564–65; *see also Williams,* 562 F.2d at 1086; *Minority Police Officers Ass'n,* 801 F.2d at 967; *Betts,* 827 F.Supp. at 1405.

"Evidence of disparate treatment is highly probative of discriminatory intent in civil rights cases." *Propst v. Leapley,* 886 F.2d 1068, 1070 (8th Cir.1989); *see also Village of Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564 (noting that disparate impact of action provides "an important starting point"); *Jenkins ex rel. Agyei v. Missouri,* 904 F.2d 415, 422 (8th Cir.1990) (Gibson, J., concurring). However, as the Eleventh Circuit Court of Appeals has held, in order to raise an inference of discriminatory purpose through the use of statistical deviations, the plaintiff must provide "exceptionally clear proof" of discrimination. *Fuller v. Georgia State Bd. of Pardons and Paroles,* 851 F.2d 1307, 1310 (11th Cir.1988).[3] The Supreme Court has pointed out that:

> If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors, entered into the ... process.

*Castaneda v. Partida,* 430 U.S. 482, 494 n. 13, 97 S.Ct. 1272, 1280 n. 13, 51 L.Ed.2d 498 (1977). If such a substantial statistical showing is made, "the burden shifts to the state to 'dispel' the inference of intentional discrimination." *Santiago v. Miles,* 774 F.Supp. 775, 799 (W.D.N.Y.1991).

Here Giles has not made any such statistical showing or relied upon statistical evidence in any way. Rather, Giles attempts to raise an inference of discrimination by comparing his disciplinary case to other "similarly situated" white inmates who he alleges received more favorable disciplinary treatment than he received. The Court finds Plaintiff's argument that Defendants treated similarly situated white inmates more favorably than him to be unpersuasive. Plaintiff asserts that the named white inmates must be considered similarly situated because they were found to be in violation of prison rules for playing either their television or radio too loudly. However, the decision as to what sanction to impose for a particular rule violation may be based on the factors set out in Section III(D)(12) of the ISP Handbook.

Giles has not shown himself to be similarly situated, considering such factors, with the three white inmates who received sanctions for playing either their television of radio too loud. *See generally Anderson v. University of Wisconsin,* 665 F.Supp. 1372, 1395 (W.D.Wis.1987), *aff'd,* 841 F.2d 737 (7th Cir.1988) (holding that comparison between plaintiff african-american law student who was expelled for academic reasons and white student with psychiatric disorder was "like comparing apples with oranges.").[4] This conclusion is exemplified by the fact that Miller was found to have violated rule 27 of the ISP Handbook, which pertains to disruptive or obstructive conduct. Similarly, McGonigle's first two sanctions were also for rule 27 violations, not rule 23 violations. Furthermore, it bears noting that there is no discernable pattern to the sanctions. This is not a case in which an african-american inmate was sanctioned for violation of prison rules while white inmates received no punishment for similar actions. Indeed, Miller received a more severe sanction than did Giles, while McGonigle received a substantially less

---

3. The Eleventh Circuit's requirement of "exceptionally clear proof" follows from the Supreme Court's decision in *McCleskey,* in which the Court stated:

> Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abuse.

*McCleskey,* 481 U.S. at 297, 107 S.Ct. at 1769–70.

4. In the related context of a claim of class discrimination, the facts of two or three individual cases are "insufficient to provide more than minimal support to an inference of classwide purposeful discrimination." *Inmates of Nebraska Penal and Correctional Complex v. Greenholtz,* 567 F.2d 1368, 1381 (8th Cir.1977).

severe sentence for his first infraction.[5] Greer, on the other hand, received the same sentence, but imposition of the sanction of the loss of his radio was suspended "to encourage good conduct."

The evidence mustered by Giles in this case is substantially less than that seen in *Propst,* 886 F.2d at 1069–70. In that case, a white inmate and an african-american inmate were involved in an altercation. *Id.* Both were charged with the same offenses, but while the white inmate was found guilty and received disciplinary sanctions, the african-american inmate was found not guilty on all charges. *Id.* In addition to presenting evidence of disparate treatment in his particular case, the plaintiff in *Propst* also offered direct evidence of prior race-based discrimination at the correctional facility and that his case had been prejudged prior to the disciplinary hearing. *Id.* at 1070. Here, by contrast, Giles made no showing of systematic discrimination based on race nor of a history of racial discrimination in the imposition of disciplinary sanctions. The prison disciplinary records make no reference about Giles' race nor do they otherwise evidence a discriminatory intent on the part of prison officials to subject Giles to punishment on account of his race.

█ Although the court has concluded that Giles has not carried his burden of proving by a preponderance of the evidence that his punishment was the product of racial discrimination, the court is nonetheless left with the distinct impression that the imposition of sanctions at ISP, at least with respect to violations related to failing to stop playing radios or televisions at excessive volume levels, is imposed in an extremely subjective manner, lacking any articulated objective standards.[6] This conclusion reflects the fact

that although the ISP Handbook denotes several factors which the prison authorities are to consider in imposing sanctions, the prison officials who testified could offer no specific factors which would suggest a logical nexus between each inmate's specific rule violation and the punishment imposed. Harper's concession that he typically does not have an inmate's disciplinary file in front of him at the time he decides punishment, even though he is to consider an inmate's prior disciplinary history in arriving at a sentence, reinforces the notion that punishment at ISP is dispensed in a haphazard fashion. The fact that the court concludes that Giles' punishment may have been dispensed arbitrarily, however, does not equate to a finding that it was done with a discriminatory purpose based upon Giles' race.

The court, therefore, concludes that Giles has not proved he was subjected to racial discrimination in the imposition of prison discipline.

### *ORDER*

It is, therefore, the order and judgment of the court that judgment be entered for the Defendants and Plaintiff's complaint be dismissed.

IT IS SO ORDERED.

---

5. McGonigle received an equivalent punishment for his third violation.

6. The court notes that Giles does not raise a substantive due process claim under the Fourteenth Amendment. As the Eighth Circuit explained:

> A plaintiff asserting a substantive due process claim must establish that the government action complained of is "truly irrational", that is, "something more than ... arbitrary, capricious, or in violation of state law." *Chester-field Development Corp. v. City of Chesterfield,* 963 F.2d 1102 (8th Cir.1992) (quoting *Lemke v. Cass County,* 846 F.2d 469, 470–72 (8th Cir. 1987) (en banc) (Arnold J., concurring)).

*Anderson v. Douglas County,* 4 F.3d 574, 577 (8th Cir.1993). Here Giles has not asserted allegations of deliberate and arbitrary governmental abuse of power such that would trigger a substantive due process claim under the Fourteenth Amendment.